Filed 3/8/13  In re Adrian P. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re ADRIAN P., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARIO M.,<br><br>        Defendant and Appellant. | A136159<br><br>(Sonoma County<br>Super. Ct. No. 3770) |

Mario M. appeals from an order terminating his parental rights to his now 17-month-old daughter. He contends the court violated his right to due process by setting the permanency planning hearing without first providing him a reasonable chance to establish his paternity and fitness as a parent and that the violation of his constitutional rights was compounded by the failure of the Sonoma County Human Services Agency (the agency) to exercise due diligence in providing timely notice of the proceedings. We conclude that any potential violation of Mario's rights was harmless and shall affirm the judgment.

**Factual and Procedural History**

Daughter was detained immediately upon her birth in October 2011. A petition filed two days later alleged that she came within the meaning of Welfare and Institutions

1

Code[1] section 300, subdivisions (b) and (g), in that mother was currently hospitalized in the psychiatric ward of Marin General Hospital, had ongoing mental health issues that rendered her unable to safely parent and protect the child, and had failed to seek any prenatal care for her due to paranoid thoughts. The petition identifies Mario as the alleged father and indicates that his address is unknown.

On October 24, the agency submitted a detention report stating that the whereabouts of the alleged father were still unknown. At the hearing, the child was detained and placed in emergency foster care. In an amended petition filed in November 2011, a second man was named as an additional alleged father.

On November 15, the agency submitted its jurisdiction report. The report states, "The Department will continue to seek the whereabouts of the alleged father Mario [M]. If his whereabouts cannot be determined, a diligent search affidavit will be attached to the disposition report detailing search efforts." The report recommends that the court establish jurisdiction but delay making any dispositional findings because, among other things, "[t]he paternity of the child has not been established." The report explains that bifurcation of jurisdiction and disposition will allow the department additional time to search for Mario and time to conduct DNA testing on both Mario and the other alleged father. On November 17, the court sustained the allegations of the petition and set a dispositional hearing for December 21.

On December 20, 2011, the agency submitted its disposition report. The report indicates that on December 15 the agency was able to locate Mario by telephone. The report explains, "As this report was being completed, the worker came into possession of a phone number reputedly active to Mario [M.] She was able to reach [Mario], confirm that he is indeed the Mario [M.] which she has sought, and inform him of the situation in a general way, including noticing him of the next hearing. [Mario] stated that he would attend that hearing, and that he desires that the court order paternity testing for him. [Mario] asked if he might be able to gain custody of [his daughter] should tests indicate

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise noted.

2

that he is her father; the undersigned responded frankly that she thought it was unlikely, and asked [him] if he currently has a home, as he does have a history of homelessness. [Mario] replied, 'Not a home you'd want to bring a baby to.' This writer and [Mario] agreed that the first step was for him to appear in court, have counsel appointed, and request paternity testing orders." Based on its estimate that DNA testing would take a minimum of 6-8 weeks to complete, the agency recommended that the court set a permanency planning hearing pursuant to section 366.26, "with the understanding on the part of both alleged fathers, the department, State Adoptions and the fost-adopt placement that there are uncertainties and there is a possibility of the disposition of this case being changed to family reunification."

Mario appeared at the December disposition hearing and informed the court that if he was determined to be the child's father, he wanted to be involved in her life and that he might have relatives interested in having her placed with them. The court ordered paternity testing and set the section 366.26 hearing for April 2012. Although advised of his rights, Mario did not seek writ review of the order setting the section 366.26 hearing.

On March 23, 2012, the agency submitted its section 366.26 report. The report recommends termination of parental rights and adoption as the permanent plan for the child. The report indicates that since the December hearing, DNA testing had confirmed that the other alleged father is not the child's biological father and that while Mario had been advised that he needs to contact child support services to schedule a time to provide a DNA sample for the paternity test, as of the date of the report he had failed to do so.

At the hearing on April 19, Mario's attorney informed the court that DNA testing had confirmed that Mario is the child's biological father and that Mario requested that his status be elevated to a biological father and that he be granted visitation. The agency and the child's counsel opposed visitation in part on the ground that Mario was in jail. The court ruled that it would not order visitation or elevate Mario's status until written documentation of the test results was filed with the court. The section 366.26 hearing was continued for trial in May and later continued until June 21.

On June 21, Mario filed a petition for modification under section 388 alleging that he is the biological father and requesting that his status be elevated to a presumed father and that reunification services and visitation be ordered. On the same day, the agency filed an addendum to its section 366.26 report. The report confirmed that DNA testing had established Mario to be the child's biological father. The report states that the agency received the testing results on March 26 and notified Mario of the results but that Mario had not contacted the department. The report continues, "[Mario] was arrested on March 17, 2012 for . . . assault with a deadly weapon and seven counts of [violating probation]. In addition, while incarcerated, [Mario] was charged with [false imprisonment and assault with the intent to commit rape], for an incident that occurred on February 7, 2012. . . . [¶] On June 15, 2012, the undersigned interviewed [Mario] at the Sonoma County main adult detention facility. [He] reported to the undersigned that he was in jail for assaulting his roommate. He stated he would be getting out of jail June 26, 2012, and plans to move to Florida and live with his brother. The undersigned questioned [him] regarding his experience as a parent and motivation for wanting to parent [his daughter]. He reported that he has a eighteen year old son . . . who he has never had a relationship with . . . does not know his whereabouts. [He] stated, 'I don't want to lose custody of my baby, but I want her to have a good home,' and be raised around her family. At no time during the interview did [Mario] inquire about [his daughter]." The social worker found Mario to be "disorganized" and that it was difficult to understand his responses to her questions. Mario acknowledged that he suffers from "stress" and "anxiety" but denied hearing voices despite a prior diagnosis of schizophrenia. The social worker recommended that Mario be deemed the biological father, not a presumed father, and that no services should be offered. The report explains that in addition to the pending criminal charges, Mario's unresolved mental health issues, substance abuse issues, homelessness, and inability to be accountable for his actions make it unlikely that he has the capacity to provide for the child.

The trial court rejected the agency's argument that Mario's modification petition be summarily denied. The court explained that Mario had a due process right to a hearing

4

to determine whether he qualified as a presumed father, which needed to be resolved independently of whether reunification services should be provided. Before proceeding to the section 366.26 hearing, the court allowed Mario to testify in support of his petition. Mario acknowledged that he was aware that the mother was pregnant but he did nothing to help her financially or otherwise during her pregnancy because she was still with her boyfriend and she did not ask for anything. He did not know that she had the baby until the mother contacted him to let him know that child protective services had custody of the baby. At that time, she told him that soon he would be DNA tested. Following closing arguments, the court found that Mario did not qualify as a presumed father. The court advised Mario that as a biological father, he had no standing at the section 366.26 hearing but allowed him to make a final statement to the court. Thereafter, the court terminated parental rights and selected adoption as the permanent plan for the child. Mario filed a timely notice of appeal.

## Discussion

Although Mario purports to challenge the denial of his modification petition and the resulting order terminating his parental rights, he asserts no argument that the court erred with respect to any ruling made on June 21. In particular, he does not challenge the trial court's finding that he did not meet the standard of a presumed father.[2] Rather, he

---

[2] In order to qualify as a presumed father, a father must fall within one of several categories enumerated in Family Code section 7611, including the only relevant category here, subdivision (d), which requires a biological father to "receive[] the child into his home and openly hold[] out the child as his natural child." "In determining whether a biological father has demonstrated such a commitment, '[t]he father's conduct both *before* and *after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate "a willingness himself to assume full custody of the child-not merely to block adoption by others." ' [Citation.] 'A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child.' " (*In re Zacharia D*. (1993) 6 Cal.4th 435, 450, fn. 19, citing *Adoption of Kelsey S*. (1992) 1 Cal.4th 816, 849.) It is for the trier of fact to determine whether a father has established by a preponderance of the evidence that he met the

5

argues that violations of his right to due process that occurred earlier in the proceedings require reversal of the challenged orders.

He argues that the court erred "by setting the section 366.26 hearing on the day of [his] first court appearance, without giving him a chance to establish his paternity or his fitness for parenthood." He relies on *In re Julia U*. (1998) 64 Cal.App.4th 532, 544, in which the appellate court held that the juvenile court had violated the constitutional rights of the unwed, biological father by denying reunification services and setting a section 366.26 hearing prior to any consideration of the father's commitment to the child and his fitness as a parent. The court explained that prior to setting a section 366.26 hearing it is important to determine if an unwed father qualifies as a presumed father under *Zacharia D*., *supra,* 6 Cal.4th at page 447, because the balance between a parent's right to reunification and a child's interest in stability shifts upon the setting of the permanency planning hearing. "The proceeding terminating reunification services and setting a section 366.26 hearing is usually the parents' last opportunity to litigate the issue of parental fitness as it relates to any subsequent termination of parental rights, or to seek the child's return to parental custody. [Citation]. Up until the time the section 366.26 hearing is set, the parents' interest in reunification is given precedence over a child's need for stability and permanency." (*In re Julia U*., *supra,* at p. 543.)

Putting aside any question of waiver, and assuming without deciding that Mario's due process rights were violated by the premature scheduling of the section 366.26 hearing, any such error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *In re Mark A*. (2007) 156 Cal.App.4th 1124, 1146 ["the weight of authority in California applies the *Chapman* harmless error standard in juvenile dependency proceedings where the error is of constitutional dimension"].)

Had the court postponed setting the section 366.26 hearing until the paternity testing was complete, the outcome here would have been no different. Unlike in *In re*

_____

requirements of a presumed father. We review the juvenile court's ruling for substantial evidence. (*In re Spencer W*. (1996) 48 Cal.App.4th 1647, 1651-1653.)

*Julia U.*, *supra*, in which the appellate court found that the father met the requirements of a presumed father, the trial court in this case found that Mario did not qualify as a presumed father and, as noted above, Mario has not challenged this finding.[3] Because that finding was based on Mario's conduct during the mother's pregnancy and immediately following the child's birth, the same facts on which the court relied in denying Mario's request to be declared a presumed father in June 2012, would have supported the finding in December 2011 when he first appeared in these proceedings, or in March 2012 when the DNA testing was completed.

As a biological father, Mario was not entitled to services unless the court found under section 361.5, subdivision (a) that services would "benefit the child." By the time the test results were available in March, Mario was in custody on new criminal charges and had taken no steps to stabilize his mental health or living situation so it is highly improbable that the court would have found the provision of services to have been in the child's best interest. Thus, the alleged premature setting of the section 366.26 hearing did not interfere prejudicially with Mario's ability to establish his fitness as a parent.

Mario also argues that by failing to give proper notice and exercise due diligence to locate, the agency deprived him of his due process rights, which were not safeguarded by either the trial court or [his] trial counsel." While we do not believe that Mario has established a lack of due diligence on the part of the department, in all events the two month delay in providing notice to Mario was harmless for the reasons discussed above.

**Disposition**

The order terminating parental rights is affirmed.

---

[3] It does not appear that the trial court in *Julia U.*, *supra*, 64 Cal.App.4th 532 held an evidentiary hearing to determine whether the father met the requirements of a presumed father. (*Id*. at pp. 538-539.) Rather, as the appellate court observed, in denying father's petition, the juvenile court focused on the child's best interests and overlooked father's recognizable interest in his parentage. (*Id*. at p. 543.)

_____

Pollak, J.



We concur:



_____

McGuiness, P. J.



_____

Jenkins, J.